UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

DAVID D. BROWN,

        Petitioner,

        v.                                Case No. 05-C-1241

WILLIAM POLLARD,

        Respondent.

---

ORDER DENYING § 2254 PETITION AND DISMISSING CASE

On November 21, 2005, David D. Brown filed a petition under 28 U.S.C. § 2254, asserting that his state court conviction and sentence were imposed in violation of the Constitution. Brown filed the petition in the Western District of Wisconsin. However, District Judge Barbara B. Crabb transferred the case to this district because the court of conviction and Brown's place of incarceration are within the Eastern District of Wisconsin. On December 8, 2005, this court screened the habeas petition and dismissed two of the three claims. However, the court ordered William Pollard to file an answer regarding the remaining claim, one of ineffective assistance of counsel. Following the filing of Pollard's answer, the remaining claim was briefed.

Brown was convicted in Outagamie County Circuit Court of burglary, three counts of sexual assault, and false imprisonment. He was sentenced to four concurrent terms of eleven years and six months of imprisonment, to be followed by eighteen years and six months of extended supervision, plus a five-year probation or extended supervision term. (Answer, Ex. A, Ex. O at 112.) Brown was incarcerated at Green Bay Correctional

Institution when he filed his petition; since then he has been transferred to Oshkosh Correctional Institution.

Respondent William Pollard admits that Brown's habeas petition is timely and is not a second or successive petition. (Answer ¶¶ 8, 9.)

In his petition, Brown asserts a denial of effective appellate counsel. He alleges that in a postconviction proceeding the trial judge found trial counsel's performance defective regarding his failure to call a critical witness to the stand, but concluded that Brown was not prejudiced by the single error. Brown maintains that his appellate attorney, Gerald Boyle, assigned five different attorneys to his case and refused to raise additional errors of trial counsel, which cumulatively would have met the prejudice standard for ineffective assistance of counsel. (Transfer Rec. from W.D. Wis., Pet. ¶ 12A.) However, Brown does not specify in his petition what those additional errors were.

In his brief, Brown argues that Boyle failed to raise five errors of trial counsel. In addition, Brown raises the same errors of trial counsel, plus one other, as separate ineffective assistance of counsel claims. Brown continues to argue that Boyle assigned five different attorneys to his appeal.

STANDARD OF REVIEW

A writ of habeas corpus may not be granted as to any claim that was adjudicated on the merits in state court unless the decision on that claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" U.S. Supreme Court law or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" Supreme Court law if the state court

2

arrived at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decided the case differently than the Supreme Court on facts that are materially indistinguishable. *Williams v. Taylor*, 529 U.S. 362, 405-06, 413 (2000). A state court decision is an "unreasonable application" of Supreme Court law if it identified the correct governing legal principle but applied that principle to the facts of the case unreasonably. *Id.* at 407-09, 413. A federal court analyzing the unreasonable- application prong "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. Further, a state court's fact determinations are presumed correct and a petitioner must rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

LAW ON INEFFECTIVE ASSISTANCE OF COUNSEL

To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance was deficient, and (2) that the petitioner was prejudiced as a result. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

For the performance prong of the *Strickland* test, the petitioner must establish that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The court must determine "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. *Strickland* permits a wide latitude of permissible attorney conduct. *See id.* at 689. The petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks deleted); *see also Washington v. Smith*, 219 F.3d 620, 627 (7th Cir. 2000). Judicial scrutiny is highly deferential and the court strongly presumes that counsel's conduct was

3

reasonable. *Strickland*, 466 U.S. at 689. Counsel's performance must be evaluated from his or her perspective at the time; hindsight should not distort the evaluation. *Id.*

To establish prejudice a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *Id.* at 697.

PROCEDURAL HISTORY

Brown was convicted of burglary and the rape of his ex-wife's good friend. At trial, the victim testified about waking in the early hours of November 3, 2000, to find an unknown male assailant opening the sliding door to the deck off of her bedroom and then being raped by him. The victim stated that she scratched the intruder and that he had escaped by running out the sliding door and jumping off of the deck. DNA testing of her fingernail scrapings indicated that it was five trillion times more likely that the DNA came from Brown than from any other individual. (Answer, Ex. DD at 39-40.) Brown and the victim had some animosity between them inasmuch as she called the police in July 2000 asking that they check on the well-being of Brown's ex-wife. (*See id.* at 122-25, 155-56.)

Brown admitted on the stand that he had sex with the victim in the early hours of November 3, 2000, claiming it was consensual. According to Brown, after his 3:00 to 11:00 work shift and a couple hours of drinking with friends at a bar, he drove to the victim's home to talk regarding his relationship with his ex-wife (with whom he was living) and the victim's relationship with her ex-husband (who had been at the bar with Brown). However, the victim was not expecting Brown's visit. (*Id.* at 90-96.) Brown said he

4

knocked on and tried opening several doors and, finally, the victim admitted him through a door on a lower patio. (*Id.* at 96-98.) He and the victim decided to have sex instead of talking about their ex-spouses. (*Id.* at 99-103.) Brown testified that during sex, he called the victim a "slut," which angered her and caused her to attack him. (*Id.* at 104-05.) To get away from the bad situation, Brown stated that he ran from the room and jumped off of the deck, injuring his ankle or foot. (*Id.* at 105-06.) Brown acknowledged that he initially told his ex-wife and the emergency doctor fictitious stories about breaking his foot when he was walking the dog, jogging and stepping on a stone or maybe a hole or firepit. (*Id.* at 133, 135-36.)

Brown testified that on or about November 7, 2000, he told his pastor, during the pastor's visit to jail, about the consensual sex. (*Id.* at 163.) However, the prosecutor argued that Brown made up the story of consensual sex only after the DNA evidence came back confirming his presence at the victim's home. (*See id.*) At trial and sentencing, Brown was represented by Kevin Musolf.[1]

Following conviction, Brown switched attorneys, hiring Attorney Gerald Boyle. Boyle's firm filed a postconviction motion under Wis. Stat. § 809.30 (Answer, Ex. B), asserting that Musolf provided ineffective legal assistance by not calling Brown's pastor as a witness (*id.* at 3-6).[2] At the hearing on the postconviction motion the pastor testified that within a couple of weeks of November 3, 2000, Brown told him that in the early morning of November 3 he had gone to the house of his wife's girlfriend to discuss problems in his

---

[1]Additional testimony from trial will be referenced below in the Discussion section.

[2]The Boyle firm also argued that the trial court abused its discretion at sentencing (Answer, Ex. B at 6-9), but that issue is not raised in this habeas case and will not be discussed further.

5

marriage and ended up have consensual sex with her. (Answer, Ex. C at 19-27.) The pastor advised that Brown had mentioned that during sex he had said something which angered the woman, and that he left quickly by jumping off a deck or patio. (*Id.* at 25-27.)

Attorney Musolf testified that before trial he was aware Brown had told the story to the pastor early in November 2000 (*id.* at 6), but did not interview the pastor or call him to testify at trial, initially because he was concerned about any confession that Brown might have made to the pastor and potential inconsistency with Brown's testimony; later he concluded it was too late to call the pastor in light of Brown's cross-examination. (*Id.* at 8-10, 13). Boyle argued that the pastor's testimony at trial would have strengthened Brown's version of events, as it showed that Brown did not make up the story in response to the DNA evidence.

The state trial court denied Brown's postconviction § 809.30 motion. In the trial court's opinion, Musolf's failure to call the pastor to the stand was deficient performance under the *Strickland* standard. However, the court found that Brown was not prejudiced by the failure:

> Regarding the ineffective assistance of counsel, when Defense counsel has a client and the client says, "Well, shortly after the offenses, I made statement to these people," and the Defense attorney does not check into that, it seems like that to the Court is below the standard for what a Defense attorney should do because any time the defendant does take the witness stand, obviously they are going to be attacked on their credibility. If you just do not go that next step and, you know, ask the questions of these potential witnesses, you are not in a position to even have a trial strategy. Strategy doesn't come in until you talk to the witness.

> So Attorney Musolf has indicated he felt he made an error himself. He did not talk to the pastor, and some of the statements that were made could have been used for

6

corroborating the defendant's story. So the first prong of the *Strickland* test, I think, has been met by the Defense.

Now, as both counsel have agreed, this case was a very strong case presented by the State, and I believe the jury concluded that the defendant's statement was not worthy of belief whatsoever because of the overwhelming evidence.

Now, was he prejudiced by this error? I think it's hard to predict. But because of the overwhelming nature of the evidence in the case, I conclude that although an error occurred and it was ineffective, that the defendant was not prejudiced by that error and the motion is denied.

(*Id.* at 49-50.)

Brown appealed, raising the same issue of ineffective assistance of counsel

for failing to call the pastor as a witness. (Answer, Ex. E at 14-26.) The Wisconsin Court

of Appeals affirmed. (Answer, Ex. H.) It found:

Brown told the same story [as he told at trial] to his pastor three days after his arrest. He argues that his trial counsel should have called Pastor Lenz to testify at trial to "corroborate" Brown's testimony. Brown has not established that he was prejudiced by his counsel's failure to call Pastor Lenz. To establish prejudice, he must show a reasonable probability that, but for his counsel's unprofessional errors, the result of the trial would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). A reasonable probability is one that undermines confidence in the outcome. *Id.*

Lenz's testimony may have been admissible . . . to rebut an allegation of recent fabrication, but it was not persuasive. Lenz's testimony would not have corroborated Brown's testimony. Lenz had no independent knowledge of any of the facts. The sole source of his information was Brown himself. Lenz's testimony would merely have established that Brown told the same story after his arrest as he presented at trial. Counsel's failure to call Lenz does not undermine our confidence in the verdicts.

(*Id.* at 2-3.)

7

The Wisconsin Supreme Court denied review of the case.  (Answer, Ex. K.)

Following the appellate decisions, Brown filed a federal habeas petition in the Western District of Wisconsin, asserting claims in addition to the claim of ineffective assistance of counsel he had raised in the state-court § 809.30 motion.  United States District Court Judge Barbara B. Crabb, in a decision of February 2, 2004, found that Brown had not exhausted his state remedies because he had not filed a § 974.06 motion.  Hence, she dismissed the petition without prejudice.  (Answer, Ex. O at 125-134.)

Thereafter, Brown filed a postconviction motion under Wis. Stat. § 974.06, in which he argued ineffective assistance of counsel.  (Answer, Ex. L.)  His arguments in support of relief are unclear, as the motion referenced attachments which are not part of this record.  (*See id.* at 114 (referencing attachments for statement of facts).)  However, as framed by the state in its response to the § 974.06 motion, Brown asserted (1) ineffective assistance of trial counsel relating to the failure to call the pastor as a witness, (2) ineffective assistance of trial and appellate counsel for failure to raise "issues of importance," and (3) denial of a right to appeal.  (Answer, Ex. M at 1.)  The § 974.06 motion was denied.  Notwithstanding Brown's new ineffective assistance claims and the reference to ineffective assistance of postconviction or appellate counsel, the trial court found that the issue of ineffective legal assistance had been litigated in the § 809.30 postconviction motion and could not be raised again.  (*See* Answer, Ex. N at 147.)

Brown appealed, claiming that his trial lawyer was ineffective for failing to call his pastor to testify; to present evidence of his social anxiety disorder, which affected his testimony; to challenge police reports; to have a trial strategy; to challenge the proof regarding where he entered the victim's home; to interview the emergency room staff who

treated the victim; to call witnesses to prove he knew a deceased man named John Sanderfoot; and to establish that he did not speak to anyone over a lunch break during trial. (Answer, Ex. O at 17-18.) Brown also described the progression of attorneys on his case. He said he had hired Boyle, Boyle & Smith to represent him, with Gerald Boyle as "direct counsel." (*Id.* at 19.) However, Boyle handed the case to Jonathan Smith, who left the firm shortly afterward. Boyle then gave the case to Melissa Karls, a new attorney. Later, Karls left the firm and Denise Romer was assigned the case for about one week. Boyle then gave the case to Joseph Paulus, who failed to accept Brown's phone calls, was dismissed from the law firm and subsequently convicted of a federal offense. By that time, according to Brown, his federal habeas petition was due, and Boyle directed him to represent himself. (*Id.* at 19-20.)

> The Wisconsin Court of Appeals affirmed the denial of the § 974.06 motion:
>
> Brown asserts postconviction counsel should have challenged trial counsel's failure to: . . . (3) challenge misrepresentations in the police reports; (4) call rebuttal witnesses to prove that he knew of John Sanderfoot's death and did not learn of it during trial; (5) challenge the State's proof regarding where Brown entered the house; and (6) interview emergency room staff who treated the victim. We are not persuaded.
>
> . . . .
>
> To the extent Brown argues the police reports were full of misrepresentations, Brown's claim is nothing more than an unattended conclusion. This court declines to consider arguments that are undeveloped. *See State v. Gulrud*, 140 Wis. 2d 721, 730, 412 N.W.2d 139 (Ct. App. 1987). Brown also contends that trial counsel should have interviewed the emergency room staff who treated the victim. The emergency room doctor and the nurse who administered the sexual assault kit both testified at trial as to the victim's injuries and Brown does not identify what additional information trial counsel should have garnered from them. Brown additionally

9

claims, without elaboration, that a crisis intervention caller should have been interviewed. Brown has failed to establish how he was prejudiced by any claimed deficiency on the part of his trial counsel to interview these individuals.

Brown additionally claims trial counsel was ineffective for "failing to challenge the State's proof regarding where he entered the house." At trial, defense counsel cross-examined the victim regarding her testimony as to where Brown entered her house. Brown does not explain what more counsel should have done nor how he was prejudiced by the claimed deficiency.

Finally, Brown contends that trial counsel was ineffective for failing to call rebuttal witnesses to prove that he knew of Sanderfoot's death and did not learn of it during trial. As noted above, Brown testified that he went to see the victim to talk about Sanderfoot's alleged relationship with Brown's wife. . . . On cross-examination, Brown nevertheless indicated he knew Sanderfoot had died before he went to see the victim. Brown fails to explain how a rebuttal witness could have altered Brown's contradictory testimony. We therefore conclude Brown was not prejudiced by counsel's claimed deficiency in failing to call rebuttal witnesses.

Because trial counsel was not ineffective, we conclude postconviction counsel was not ineffective for failing to raise Brown's claims regarding the ineffective assistance of trial counsel. Counsel is not required to raise on appeal under Wis. Stat. Rule 809.30 every nonfrivolous issue the defendant requests.

(Answer, Ex. R at 3-5.) The Wisconsin Supreme Court denied review. (Answer, Ex. U.)

DISCUSSION

A.     Ineffective Assistance of Postconviction and Appellate Counsel

The court begins with Brown's claim as pled in the pending petition: ineffective assistance of postconviction and appellate counsel. Brown raised this claim in his § 974.06 motion. Although the Wisconsin Court of Appeals did not mention *Strickland* in ruling against him, it appears that the court used the *Strickland* standard in discussing

possible deficiencies by counsel and referencing Brown's failure to establish prejudice. Regardless, Brown's claim fails even after a de novo review.

One of Brown's arguments – that the Boyle law firm's assignment of five different attorneys to his case resulted in ineffective assistance – can be dispatched quickly. Brown has shown neither defective performance nor any prejudice as a consequence of multiple attorneys being assigned to his case. The postconviction transcript and appeal filings show that Attorney Gerald Boyle and his law firm represented Brown throughout the process, regardless of who at the law firm appeared. (Answer, Ex. C at 1, Ex. E at 1, Ex. I at 1.) Brown points to no instances where a Boyle associate mishandled any matters requiring attention; nor has he shown any deficiency at all. Attorney Melissa Karls joined the Boyle law firm in representing Brown regarding his postconviction motion and hearing (Answer, Ex. B at 10, Ex. C at 1). Further, Karls filed Brown's appellate brief and petition in the Wisconsin Supreme Court and there was no inconsistency in the representation given. (Answer, Ex. E at 1, Ex. I at 1.)

Following direct appeal, Brown had no right to counsel. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further."); *Graham v. Borgen*, 483 F.3d 475, 481 (7th Cir. 2007) ("[A] criminal defendant in Wisconsin has no right to counsel for a collateral attack under § 974.06 as he would on direct appeal."). Consequently, if Boyle assigned attorneys to Brown's case subsequent to the direct appeal, for instance to prepare a § 974.06 motion or federal habeas petition, no right to counsel was implicated and there was no right to effective counsel.

11

The remainder of Brown's challenge is to the actions of "postconviction" counsel. *See State ex rel. Rothering v. McCaughtry*, 205 Wis. 2d 675, 678-79 (Ct. App. 1996). Although Brown references appellate counsel in his filing, he is using the term incorrectly with regard to his § 809.30 motions. Under Wisconsin law, counsel for motions in the trial court under § 809.30 is called "postconviction counsel." "Appellate counsel" refers to attorneys representing the defendant for the appellate brief and oral argument before the Wisconsin Court of Appeals. *See id.*

As correctly identified by Judge Crabb in her decision of February 2, 2004, Brown is attacking his attorneys' choice at the § 809.30 stage to raise only the issue of the pastor's testimony. (Answer, Ex. O at 128.) At the appellate stage before the Wisconsin Court of Appeals Boyle was tied to pursuing the arguments made previously; he could not raise new claims of ineffective assistance of counsel at that point. (*See id.*) As in *Rothering*, "[t]he allegedly deficient conduct is not what occurred before [the Wisconsin Court of Appeals] but rather what should have occurred before the trial court by a motion filed by postconviction counsel." 205 Wis. 2d at 679. Thus, Brown is really attacking Boyle's and Karl's actions as "postconviction counsel."[3]

Regarding the Boyle firm's decision to challenge in the § 809.30 motion only one instance of alleged deficient performance, Brown here contends that Boyle and Karl were deficient for not adding Attorney Musolf's failures to: (1) interview the emergency room staff, (2) call rebuttal witnesses regarding Brown's knowledge of Sanderfoot's death,

---

[3]"Postconviction counsel" as used in this manner, referencing counsel for § 809.30 motions, is counsel representing a defendant in proceedings between trial and the defendant's first appeal as of right and is not to be confused with the term "postconviction counsel" sometimes used for attorneys in collateral proceedings, for which there is no right to counsel, *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *Graham v. Borgen*, 483 F.3d 475, 481 (7th Cir. 2007).

(3) challenge arguments regarding Brown's entry to the victim's home, and (4) interview police and the victim.

(1)    Interviewing Emergency Room Staff

First, Brown contends that although Dr. Boris Berejan, who examined the victim the morning of November 3, 2000, was called as a defense witness, Attorney Musolf did not give the doctor any of the examination reports prior to his testimony, Musolf failed to preserve the doctor's memory by interviewing him before the trial, the doctor could not remember the victim but all the doctor could comment on was what was in the record. Brown complains that the doctor was not qualified to comment on the cause of vaginal irritation he had noted, that a diagram in the doctor's report was incomplete, that the state report indicates there was ejaculation and that the state crime lab found no traces of semen. Two sheets titled "Defense Exhibit 1," are attached to Brown's brief suggesting that those are the doctor's report. Brown contends that counsel should have interviewed the doctor

> not only to preserve there [sic] memory for testimony but to ask questions such as pertain to this two-page worksheet, why is it incomplete? how many sexual assault victims have you examined? how does this victim compare to past victims you may have examined? does there appear to be evidence of a sexual assault in this instance?

(Pet'r's Br. in Supp. at 14.)

This court is unconvinced that the two page "diagram" included in Brown's brief are the doctor's report. In testimony, defense counsel referred to the report as "Exhibit Number 9" (Answer, Ex. DD at 165), and the doctor indicated that the report included dictation regarding the victim's description of the event, her complaints, and the

13

doctor's observations.  (*See id.* at 166-69.)  Those are not included in the pages attached to Brown's brief.   In any event, Brown fails to suggest how incompleteness of the worksheet or incorrect notation of ejaculation has relevance to whether the victim consented to having sex with him.  The state crime lab, not the emergency room staff, determined the presence of semen; the doctor could only proceed based on what the victim told him and what the doctor observed.

Next, Brown fails to suggest how the doctor's failure to remember the victim impacted his testimony, i.e., how the medical reports did not cover everything the doctor could testify to.  And, finally, although perhaps Brown wanted the doctor to testify that the medical examination showed no evidence of a sexual assault, the doctor testified that although he saw irritation near the victim's vagina he could not say what caused it.  The sexual assault nurse examiner from the emergency room testified previously that such irritation could occur from sexual contact or wiping and that she saw no tearing of tissue in the vagina.  (Answer, Ex. CC at 173-74.)  Thus, counsel presented to the jury evidence indicating that in the victim's vaginal area irritation could have come from causes other than a sexual assault.   Hence, Brown fails to establish any deficiency by Musolf, his trial counsel, or any prejudice resulting therefrom, as it appears that nothing was missed by failing to interview the doctor prior to trial.

(2)     Rebuttal Witnesses on Sanderfoot Matter

Next, Brown focuses on the side issue of John Sanderfoot.   In direct testimony Brown stated that when he went to visit the victim to discuss his ex-wife, he wanted to ask her about his ex-wife's relationship with John Sanderfoot and other matters. Brown testified that he "had found out that she was seeing some guy named John

Sanderfoot, and [he] kind of wanted to know more about that." (Answer, Ex. DD at 100.)

According to Brown, he asked the victim about Sanderfoot but she "didn't want to touch on

that at all." (*Id.* at 101.) He described their conversation as involving whether Brown could

get the victim's ex-husband away from his girlfriend and whether Brown's ex-wife "could

get away from this guy or whatever." (*Id.*) At the start of cross-examination, the district

attorney focused on the Sanderfoot matter:

> Q  [Y]ou had concerns that were weighing on your mind about John Sanderfoot because you were aware he was having a relationship with your ex-wife, Brenda Brown?

> A  That's correct.

> Q  And that you viewed John Sanderfoot at that time to be an obstacle for you to get back together completely with Brenda Brown, correct?

> A  Completely I guess would be – yeah.

> Q  I mean, if she still is having the boyfriend, John Sanderfoot–

> A  She didn't have John Sanderfoot as a boyfriend at that particular time.

> Q  She had been dating him, correct?

> A  Yeah.

> Q  You didn't want him in the picture, correct?

> A  He was not in the picture.

> Q  Now, isn't it true that John Sanderfoot was somebody that bothered you because he was dating your ex-wife?

> A  That is true.

(Answer, Ex. DD at 127-28.) Very shortly after this testimony, the trial court broke for lunch. (*Id.* at 130.) That afternoon, on redirect examination, Brown clarified that Sanderfoot was not in the ex-wife's life in November 2000 because Sanderfoot had passed away before then. (*Id.* at 157.) On recross-examination, the district attorney asked whether someone had told Brown over the lunch recess that Sanderfoot was dead so he had to clarify his testimony. (*Id.* at 158-59.) Brown answered "no." (*Id.* at 159.) The following questions and answers then occurred:

> Q   You were here this morning talking about John Sanderfoot and being concerned this guy was having a relationship with your wife, and you wanted to talk to somebody about that to find out more about the relationship with John Sanderfoot, correct?
>
> A   The relationship they previously had.
>
> Q   And then you found out on the break, you found out he was dead by November, so you had to clarify that on redirect?
>
> A   That's not correct.
>
> Q   The guy was dead for two months?
>
> A   I realize that.
>
> Q   And you still considered him an obstacle enough that he was on your mind to talk to Shelly about it, correct?
>
> A   He wasn't an obstacle at the present time.
>
> Q   Then why did you bring up his name this morning on a number of occasions as to him being an obstacle, and you needed to talk to Shelly about him?
>
> A   He was previously an obstacle.

(*Id.* at 159.)

Brown argues that Musolf should have called additional witnesses to prove that he did not learn of Sanderfoot's death over the lunch break but knew of the death months before. Brown says that he had discussed Sanderfoot's death in about September 2000, with his ex-wife and the victim's ex-husband. Brown says he pleaded with Musolf to call such witnesses, but Musolf refused. (Pet'r's Br. in Supp. at 18.) Further, Brown says that the prosecution was aware that Brown was in a holding cell during the lunch break. (*Id.*)

The foregoing shows that Musolf committed no error under *Strickland* by declining to call witnesses about Brown's prior knowledge of Sanderfoot's death. The Sanderfoot testimony strayed from the facts of the case at hand. Further, Brown had clarified his testimony when he said he went to the victim's home to discuss Sanderfoot's relationship with his ex-wife, that it was a past relationship and that as of November 2000 Sanderfoot was not in the picture. Brown may have made contradictory statements as well – about whether his ex-wife "could get away from this guy or whatever." (*Id.* at 101.) But Musolf had countered those statements by getting Brown to testify on redirect that he meant a past relationship. Stopping there was not outside the wide range of professionally competent assistance.

To demonstrate prejudice a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Brown's version of the events of the early hours of November 3, 2000, contained inconsistencies about the Sanderfoot matter that would have existed even if additional witnesses had testified that Brown knew in November 2000 that Sanderfoot was dead. As noted above, although Brown testified that

17

Sanderfoot was no longer in the picture in November 2000, he also said he wondered whether his ex-wife could get away from Sanderfoot. In addition to contradictory statements about Sanderfoot, Brown admitted to the jury that he lied to his ex-wife and the emergency room doctor about how he had injured his foot, telling different versions of his injury – walking the dog, falling in a fire pit, falling in a hole, etc. Moreover, Brown's overall story of dropping in on the victim – someone to whom he usually showed animosity – uninvited and unexpectedly in the middle of the night for a counseling session – and then being invited to have sex – was generally implausible. The testimony of additional witnesses regarding Sanderfoot would have made little if any difference, even if this issue were added to the issue of the pastor's testimony for purposes of determining cumulative prejudice.

(3)     Entry to the House

        Brown contends that Musolf should have challenged more vigorously the prosecution's evidence regarding Brown's entry into the house. The victim testified that she heard the sliding door between her upstairs bedroom and the deck open; when she went to investigate she found the perpetrator, who forced his way inside. (Answer, Ex. CC at 49-51.) She said that before going to bed she had checked all the doors to make sure they were locked and had given the deck door a good pull to make sure it was locked. (*Id.* at 82.) On the other hand, Brown testified that the victim had willingly let him in a downstairs patio door.

        Brown contends that Musolf should have highlighted how paint marks on his shoes did not match the paint or black scuff marks on the deck and should have objected to testimony by police officers suggesting that it did. Further, Brown maintains that Musolf

should have noted for the jury information in the police reports regarding examination of the sliding deck door. The police reports indicated that Officers Momberg and Swanson tried several times to get the sliding door open from the locked position but could not open it. Nevertheless, Brown submits that Musolf was ineffective in failing to call additional witnesses that the sliding door could not be opened by the officers from the locked position.

Despite these charges, Musolf presented evidence that the officers' inability to open the locked sliding door when they investigated the scene, as well as other evidence drawing into question whether anyone entered the house from that door. Moreover, Musolf cross-examined Officer Donald Krueger about the sliding door. (Answer, Ex. CC at 274-75; Answer, Ex. DD at 7-9.) Krueger stated that when he was called to the scene he tested the door with Officer Momberg and that if the latch were down completely, the door could not be opened from the outside. (Answer, Ex. CC at 274-75; Answer, Ex. DD at 8.) Also, Krueger testified that he and Momberg tested the door in the locked position numerous times but could not get it open. (Answer, Ex. DD at 8.) Also, he testified that there was no damage to the door and that it did not appear to be off-track. (*Id.* at 7-8.)[4] In addition, Krueger testified that he and Momberg found two fingerprints on the door and submitted them for testing; one was the victim's print, and the other was not sufficient to determine whose it was. (*Id.* at 12.) Further, Musolf brought out evidence from another police officer that the bottom of the deck was about six feet off of the ground and the patio furniture in the victim's yard was not close enough for someone to climb onto the deck by using it.

---

[4]Other evidence brought out by the prosecution may have indicated that the door actually could be manipulated open (*see* Answer, Ex. DD at 63-64), but Musolf nevertheless brought out the evidence that Brown wanted pressed – that at least some of the officers could not open the door when it was locked.

19

(Answer, Ex. CC at 256.) Musolf then noted in closing arguments that the police officers tested the sliding door on November 3, 2000, and could not get it open when it was locked. (Answer, Ex. DD at 229.)

As for testing the paint on Brown's shoes, Musolf brought out that the police officer who thought the color of the paint was consistent with what was found on the victim's deck did not remember much about the testing and did not know whether the paint was the same. (*Id.* at 22.) Further, Musolf elicited testimony that the victim said that the perpetrator wore dark colored shoes (*id.* at 49), and that the shoes collected from Brown were white (*id.* at 30).

From this, the record discloses that Musolf *did* challenge vigorously whether the victim's home was entered through the sliding door. It was not essential for him to secure additional testimony regarding the testing of Brown's white shoes. Thus, Musolf committed no deficient performance on this point.

(4)    Interviewing Police and The victim

Brown asserts that Musolf failed to interview the police officers and the victim before trial and thereby could not establish that the victim made inconsistent statements to investigators. However, Brown points to only one potentially inconsistent statement that the victim may have made. According to Brown, a police report indicated that the victim said: "[I]t could not be David Brown [because] [h]e's a friend of the family's." (Pet'r's Br. in Supp. at 24.) Brown says that this statement would have undercut the victim's credibility.

First, if this statement was in a police report, then no separate interview of the officers or victim was needed to learn about it. Second, there was no question at trial that the victim did *not* identify Brown as a suspect. She admitted that when police arrived

at the scene she did not know who the perpetrator was and she had told police he was a stranger. (Answer, Ex. CC at 72-73.) The possibility that Brown was the perpetrator was suggested not by the victim, but by her father and then police. (*Id.* at 74.) Further, the victim testified that the last time she had seen Brown she thought he had a potbelly, and that the perpetrator did not have a potbelly. (*Id.* at 75.) Any statement by the victim that she did not think Brown was the perpetrator would have been *consistent*, not inconsistent with such testimony.

Speculation that the victim may have given some other inconsistent statements is not enough to find any deficiency in trial counsel's representation.

(5)    Conclusion Regarding Ineffective Assistance of Postconviction Counsel

Even under a de novo review, none of the alleged "failures" by Musolf constituted ineffective assistance of trial counsel as he addressed each critical issue in this case. Therefore, the Boyle law firm was not ineffective for not raising these issues. However, the Wisconsin Court of Appeals did not unreasonably apply federal law in rejecting Brown's § 974.06 claims and argument.

B.    Ineffective Assistance of Trial Counsel

Brown raises the above-described actions or failures by Musolf as independent ineffective assistance of counsel claims. However, Brown did not raise these claims in this court as required. His § 2254 petition did not include them; they arose for the first time in his brief, and the petition has not been amended. But even if considered by the court, Musolf's defense was not deficient with respect to these claims.

In his brief Brown raises one additional claim of ineffective assistance of trial: trial counsel failed to call pastor Lenz to testify at trial. Again, Brown did not properly raise

the claim in this court because his petition did not assert it. Regardless, Brown fails to meet the standard for habeas relief on this claim.

The Wisconsin Court of Appeals addressed the "Lenz" claim on the merits and referenced applicable U.S. Supreme Court law, i.e., *Strickland*, in determining that the claim failed because Brown did not show he was prejudiced from any failure to have the pastor testify. That determination was not an unreasonable application of *Strickland*. Moreover, Brown testified at trial that he told his story to his pastor in early November 2000, and defense counsel mentioned that during closing arguments. (Answer, Ex. DD at 163, 252.) Even if pastor Lenz confirmed that at trial that he spoke with Brown, it would merely establish that Brown told the same story soon after his arrest as he presented at trial. The pastor's testimony would not have established that Brown's story was actually true. The jury would still have been able to believe that the story was fiction; it was just a matter of whether the DNA evidence or the arrest itself may have generated the story. Brown's story was inconsistent with his previous relationship with the victim; that he would drop in unannounced and uninvited in the middle of the night and end up having sex with the victim was implausible; officers and medical staff testified as to the victim's emotional state when they arrived on the scene or saw her at the hospital; and Brown admitted he lied to various people about how he had injured his foot. These facts and other evidence at trial drew Brown's story into question such that the testimony of the pastor would not have created any reasonable probability of a different outcome.[5]

_____

[5]Moreover, this court disagrees with the state trial court's determination that Musolf's performance was deficient. Musolf testified at the hearing on the § 809.30 motion that he did not interview the pastor or call him to testify because he worried that in addition to telling the story about consensual sex Brown had otherwise confessed or made incriminating or inconsistent statements. Thus, Musolf chose not to call the pastor for tactical or strategic reasons and in doing so acted as competent counsel.

22

CONCLUSION

For the above-stated reasons,

IT IS ORDERED that Brown's petition for writ of habeas corpus is denied and this case is dismissed.

Dated at Milwaukee, Wisconsin, this 11th day of July, 2008.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge